**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ALONZO ROSS,

                                        Plaintiff,

            - v -                                              Civ. No. 9:14-CV-1321
                                                                      (GTS/DJS)
CARL J. KOENIGSMANN, *et al.*,

                                        Defendants.

**APPEARANCES:**                                **OF COUNSEL:**

ALONZO ROSS
Plaintiff, *Pro Se*
12-B-3789
Wende Correctional Facility
P.O. Box 1187
Alden, New York 14004

HON. ERIC T. SCHNEIDERMAN                CHRISTOPHER J. HUMMEL, ESQ.
Attorney General of the State of New York       Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**DANIEL J. STEWART**
**United States Magistrate Judge**

<u>**REPORT-RECOMMENDATION and ORDER**</u>

        On October 29, 2014, *pro se* Plaintiff Alonzo Ross, an inmate currently incarcerated at

Wende Correctional Facility, commenced this action pursuant to 42 U.S.C. § 1983, alleging that

Defendants failed to provide him with adequate medical care in violation of the Eighth Amendment

and retaliated against him in violation of the First Amendment. Dkt. No. 1, Compl. Presently before

the Court are Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for

Summary Judgment, both filed pursuant to Fed. R. Civ. P. 56. Dkt. Nos. 31, Defs.' Mot. for Summ.

J.; 64, Pl.'s Cross-Mot. for Summ. J. For the reasons that follow, the Court recommends that Defendants' Motion be **granted in part and denied in part** and Plaintiff's Cross-Motion be **denied**.

## I. BACKGROUND

The Court shall set forth the undisputed material facts and note, where relevant, where they are disputed. The relevant events of this action occurred when Plaintiff was incarcerated at Mid-State Correctional Facility ("Mid-State") in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 31-6, Defs.' Rule 7.1 Statement of Material Facts ("Defs.' SMF") at ¶ 1.

Plaintiff arrived at Mid-State from Franklin Correctional Facility ("Franklin") on April 5, 2013, and was seen by Defendant Nurse Practitioner Amy Ferguson. *Id.* at ¶ 64. At that time, Plaintiff had a number of chronic medical conditions including high cholesterol, high blood pressure, diabetes, neuropathy, lower-back pain, and sciatic nerve pain. *Id.* Plaintiff was taking the following medications, which Ferguson ordered to be continued: Pravastatin and Gemfirozil for high cholesterol; Metapropolol and Lisinopril for high blood pressure; Lantus (long-acting insulin) for diabetes; entreric-coated aspirin (ECASA) for Plaintiff's heart on account of his high blood pressure and diabetes; and Neurontin, 800mg, three times daily, for Plaintiff's chronic pain. Dkt. No. 32-4, Amy Ferguson Decl., dated Jan. 27, 2016, at ¶ 6. Plaintiff was also taking MS Contin, 60mg twice daily, which had been prescribed at Franklin in February 2013 to treat his pain. *Id.*, Ex. A. Ferguson determined that this was an inappropriate treatment for Plaintiff's chronic pain because MS Contin, a narcotic pain reliever, can be addictive and cause serious medical side effects. *Id.* at ¶ 8. She therefore ordered that Plaintiff's prescription be tapered off and discontinued. *Id.*, Ex. A. Plaintiff claims that the reason Ferguson discontinued the MS Contin was that she remembered that

he had been previously housed at Mid-State in 2009 and his chronic pain had not been treated with narcotics at that time. Compl. at ¶ 4; Dkt. No. 31-1, Christopher J. Hummel Affirm., Ex. A, Dep. of Alonzo Ross, dated Aug. 24, 2015 ("Pl.'s Dep."), at p. 89.

On April 8 and April 12, 2013, Plaintiff saw Defendant Nurse Pamela Reese through sick call. Dkt. No. 32-5, Pamela Reese Decl., dated Jan. 29, 2016, Ex. A. Reese noted that Plaintiff was currently being tapered off MS Contin and advised him to discuss it with Ferguson at his next appointment. *Id.* Plaintiff also asked about his eyeglasses, which he had been evaluated for and had been ordered at Franklin. *Id.* Reese advised Plaintiff that the eyeglasses would be delivered to Mid-State. *Id.* at ¶ 9. Plaintiff is blind in his left eye and has floaters in his right eye. Pl.'s Dep. at pp. 65-66. The eyeglasses ordered at Franklin were for a stronger prescription. *Id.*

Plaintiff again saw Ferguson on April 23, 2013, complaining of dizziness, neck and jaw numbness, and lower-back pain. Ferguson Decl., Ex. B. Plaintiff has had lower back pain since 2009 or 2010. Pl.'s Dep. at p. 113. Imaging taken after Plaintiff was transferred out of Mid-State showed that Plaintiff has severe degenerative disc disease at L5-S1 and mild degenerative disc disease at L4-L5. Dkt. No. 1-4, Pl.'s Exs. at A-33.[1] Plaintiff has had neuropathy, which causes numbness and tingling in his arms and legs, since approximately 1995. Pl.'s Dep. at pp. 30-32. According to Ferguson's notes, Plaintiff stated that his cane, which he used for his back, was too short, and he requested a back brace. Ferguson Decl., Ex. B. Ferguson ordered that Plaintiff's cane be discontinued and that he be provided with a back brace. *Id.* Plaintiff claims that he never voiced any complaints about his cane and that Ferguson confiscated it because Plaintiff had not had a cane when he was previously housed at Mid-State in 2009. Dkt. No. 64, Pl.'s Rule 7.1 Counter-Statement

---

[1] Citations to Plaintiff's Exhibits are to the pagination assigned by Plaintiff.

of Material Facts ("Pl.'s Counter-SMF") at ¶ 69. Ferguson also recorded that Plaintiff asked about pain medications, but stated that he did not want to be put on MS Contin again. Ferguson Decl., Ex. B. Ferguson prescribed Naproxen, 500mg twice daily, to treat his chronic pain. *Id.* Plaintiff was referred to neurology to evaluate his complaints of dizziness and numbness. *Id.*

On May 1, 2013, Plaintiff went to emergency sick call complaining of difficulty breathing. Hummel Affirm., Ex. B at p. 6.[2] Defendant Dr. Ventaka Mannava examined Plaintiff and noted that he was asthmatic. *Id.* Plaintiff was provided with Albulterol. *Id.* On May 8, 2013, Plaintiff was admitted to the infirmary with complaints of chest pain, shortness of breath, abdominal pain, a headache, dizziness, and lightheadness. Hummel Affirm., Ex. B. Plaintiff claims he had had chest pains since 2011. Pl.'s Dep. at p. 25. Plaintiff had an electrocardiogram ("EKG"), which was negative. Hummel Affirm., Ex. B at pp. 4 & 6. On May 9, 2013, Plaintiff saw Defendant Dr. Subbarao Ramineni, who noted that Plaintiff's vital signs were stable and that he was not in acute distress. Dkt. No. 32-2, Subbarao Ramineni Decl., dated Jan. 27, 2016, Ex. A. Plaintiff complained of back pain and requested narcotic pain relievers. *Id.* Dr. Ramineni states that Plaintiff did not complain of chest pain. *Id.* at ¶ 6. Dr. Ramineni determined that Plaintiff's pain symptoms were controlled on Naproxen and Neurontin and ordered him to be discharged from the infirmary. *Id.* Dr. Ramineni recorded that Plaintiff was "malingering." *Id.*, Ex. A. Plaintiff became highly argumentative with Defendant Reese when he was notified that he was being discharged and correctional officers appeared to return Plaintiff to his cell. Reese Decl., Exs. B & C. Reese filed a misbehavior report against Plaintiff based on the incident. *Id.*, Ex. C. Because Plaintiff was put

---

[2] Exhibits E through G to the Hummel Affirmation were filed at a separate docket entry, because they contain medical records. *See* Dkt. No. 32-1. Citations are to the pagination assigned by the Court's Case Management Electronic Case Files ("CM/ECF") System.

into the Special Housing Unit ("SHU"), Defendant Ferguson ordered that Plaintiff's Neurontin prescription be reduced from 800mg, three times a day, to 800mg, twice daily. Ferguson Decl., Ex. C. Nurses only make rounds in SHU twice a day and a prescription would therefore be reduced to twice daily, if it could be done safely. *Id.* at ¶ 11.

The next day, on May 10, 2013, Plaintiff returned to emergency sick call complaining of body-wide pain from his sciatic nerve as well as shortness of breath. Dkt. No. 32-3, Ventaka Mannava Decl., dated Jan. 27, 2016, Ex. A. Defendant Dr. Mannava determined that Plaintiff should continue to take Naproxen and Neurontin for his chronic pain and Albulterol for his asthma. *Id.* On May 16, 2013, Plaintiff saw Dr. Mannava and requested MS Contin for his lower back pain. *Id.*, Ex. B. Dr. Mannava determined that narcotics were not indicated at that time, and ordered that Plaintiff continue with Naproxen and Neurontin. *Id.*

On May 28, 2013, Defendant Dr. Ramineni discontinued Plaintiff's prescription for Gemfibrizol, because he had been non-compliant in his use. Ramineni Decl., Ex. B. On May 31, 2013, Plaintiff saw Dr. Ramineni for lower-back pain, on both sides of his body, and complained that it was worse on movement. *Id.*, Ex. C. Dr. Ramineni determined that Plaintiff's current course of treatment was appropriate. *Id.* Dr. Ramineni also noted that tests had been performed on Plaintiff for coronary artery disease, which had come back negative for any acute condition. *Id.*

On June 10, 2013, Defendant Ferguson ordered an Electroencephalogram ("EEG") and an MRI of Plaintiff's brain on account of his headaches and head pains. Ferguson Decl. at ¶ 70. On June 27, 2013, Plaintiff saw Ferguson and requested that his Neurontin be returned to three times daily and that Ultram be prescribed for his pain symptoms. *Id.*, Ex. E. Ferguson ordered that Plaintiff's Neurontin be returned to three times daily because he was no longer in SHU, but

concluded that Ultram was not indicated because of Plaintiff's headaches and possible seizures. *Id.* Plaintiff also requested a larger back brace. *Id.* Ferguson did not have a larger back brace and sent a request to the Nurse Administrator to see if a larger brace could be obtained. *Id.* at ¶ 15.

Plaintiff experienced an episode of syncope on July 1, 2013, and was sent by Defendant Dr. Mannava to an outside hospital for further evaluation. Mannava Decl. at ¶ 7. All tests came back negative and Plaintiff was admitted to the infirmary for observation upon return. *Id.*, Ex. D. On July 3, 2013, Dr. Mannava evaluated Plaintiff and determined that he had recovered from the syncope episode and ordered that he be discharged from the infirmary and resume all current medications. *Id.*

On July 15, 2013, Plaintiff saw Defendant Ferguson with complaints of abdominal pain, kidney pain, nausea, weakness, fatigue, and shortness of breath. Ferguson Decl., Ex. F. Ferguson reviewed Plaintiff's records from when he had been sent to the outside hospital and noted that no specific cause of the episode of syncope had been determined. *Id.* She examined Plaintiff's lungs and found good air movement and no wheezing, although he was out of Albuterol. *Id.* She ordered Albuterol and blood work to determine the cause of Plaintiff's abdominal pain. *Id.* She also referred Plaintiff to mental health for anxiety. *Id.* On July 18, 2013, Plaintiff was seen by Defendant Dr. Mannava for his asthma. Mannava Decl., Ex. E. Dr. Mannava noted that Plaintiff has mild intermittent asthma, which Dr. Mannava directed to continue treating with Albuterol and advised Plaintiff to quit smoking. *Id.*

On August 18, 2013, Plaintiff was brought, with assistance, to emergency sick call complaining of chest pain and a migraine headache with visual disturbances. Hummel Affirm., Ex. D; Reese Decl., Ex. D. Plaintiff was admitted to the infirmary. Reese Decl., Ex. D. The following

day, Dr. Mannava saw Plaintiff, who expressed that his symptoms had subsided. Mannava Decl., Ex. F. Plaintiff again reported headaches, abdominal pain, and leg twitching to Defendant Ferguson on August 30, 2013. Ferguson Decl., Ex. G. She noted that Plaintiff had been referred for neurological tests and bloodwork but no cause had been identified for Plaintiff's symptoms. *Id.* She referred Plaintiff to mental health because he requested Klonopin for anxiety and scheduled a follow-up with Dr. Mannava. *Id.* Plaintiff became argumentative and had to be escorted out by security. *Id.*, Ex. H.

On September 3, 2013, Plaintiff saw Defendant Reese with a headache and claiming that he could not control his leg movement. Reese Decl., Ex. E. Reese observed that Plaintiff did not appear to be in discomfort and noted from his medical records that he had received treatment for similar complaints in the past. *Id.* She further noted that Plaintiff's medical records indicated a history of malingering. *Id.* On September 9, 2013, Plaintiff claimed he was having "jerky movements" in his head and expressed concern that he was having a stroke to Defendant Dr. Mannava. Mannava Decl., Ex. G. Dr. Mannava noted that Plaintiff had received complete neurological testing, with negative results. *Id.* Plaintiff again saw Dr. Mannava on October 3, 2013, with complaints of body-wide pain and foot pain. *Id.*, Ex. H. Plaintiff requested morphine, but Dr. Mannava determined that Plaintiff's pain symptoms were appropriately treated with his then-current medications, Naproxen and Neurontin. *Id.* Plaintiff also complained of blurred vision. *Id.* Dr. Mannava explained that the eyeglasses ordered at Franklin would be delivered to Mid-State. *Id.* at ¶ 44. Plaintiff never received the eyeglasses while he was at Mid-State, although he later received the eyeglasses after he was transferred to a different facility. Pl.'s Dep. at pp. 51-53.

On October 21, 2013, Defendant Ferguson discontinued Plaintiff's Neurontin prescription

after being informed by another nurse that he was misusing his medication by "cheeking" it. Ferguson Decl., Ex. I. Plaintiff claims that the prescription was discontinued in retaliation for having filed grievances. Compl. at ¶ 45. Plaintiff furthers claims that it would have been impossible for him to "cheek" the Neurontin because it was crushed and diluted in water. Pl.'s Dep. at pp. 137-38. On October 28, 2013, Plaintiff complained of body-wide pain to Dr. Mannava. Mannava Decl., Ex. I. Dr. Mannava discussed the misuse incident with the nurse and agreed that it had been appropriate to discontinue Plaintiff's Neurontin prescription, and that Plaintiff's pain symptoms could be adequately treated with Naproxen and ibuprofen. *Id.* at ¶ 14. Plaintiff next saw Dr. Mannava on November 14, 2013, and complained of pain in his feet and legs and stated that it was hard to walk. *Id.*, Ex. J. Dr. Mannava examined Plaintiff but did not observe any injury or deformity in his feet or legs, and determined that it was appropriate to continue treating Plaintiff's symptoms with Naproxen and ibuprofen. *Id.* Plaintiff saw Defendant Reese on December 2, 2013, again complaining of pain in his feet. Reese Decl., Ex. F. Plaintiff refused to leave sick call and had to be escorted out. *Id.*, Ex. G. Reese filed a misbehavior report against him. *Id.* The next day, December 3, 2013, Plaintiff saw Dr. Mannava for pain in his feet and "jerky movements." Mannava Decl., Ex. K. Dr. Mannava determined that it was appropriate to continue Plaintiff's current course of treatment. *Id.*

On December 11, 2013, Plaintiff went to emergency sick call with chest pressure. Ferguson Decl., Ex. J. An EKG was conducted, which revealed an atrial flutter. *Id.* Plaintiff was then sent to the emergency room at Faxton-St. Luke's Hospital for further evaluation. Hummel Affirm., Ex. E. At St. Luke's Plaintiff received an echocardiogram, which was negative. *Id.* at p. 18. Based on this and other tests, the physicians at St. Luke's concluded that Plaintiff's symptoms were likely

-8-

non-cardiac in nature and Plaintiff was therefore discharged on December 13, 2013. *Id.* at pp. 22-23.

Back at Mid-State, on December 14, 2013, Plaintiff again experienced chest pain and was returned to St. Luke's for further evaluation. Hummel Affirm., Ex. F. It was noted that Plaintiff's "cardiac risk factors are positive across the board" and Plaintiff consented to receive a cardiac catherization. *Id.* at pp. 53-54. The cardiac catheterization revealed "[s]ignificant multivessel coronary disease with tight lesion in the circumflex" and "moderate disease in the right coronary." *Id.* at pp. 51-52. Angioplasty was recommended and on December 17, 2013, the procedure was performed without complications. *Id.* at p. 63. On discharge, Plaintiff was not experiencing any chest pain and his follow-up lab work was normal. *Id.* at p. 57. Plaintiff was directed to take Plavix and aspirin for at least one year. *Id.* at p. 56. Plaintiff returned to Mid-State on December 18, 2013. Ferguson Decl., Ex. K. Defendant Ferguson noted that the angioplasty had been performed, and ordered that Plaintiff's current medications be resumed and prescribed Plaintiff Plavix, 75mg, twice daily. *Id.*, Exs. K & L. Plaintiff saw Dr. Mannava on December 19, 2013, who noted that Plaintiff was medically stable. Mannava Decl., Ex. L. On December 29, 2013, Plaintiff complained of chest pain to Dr. Mannava. *Id.*, Ex. M. Dr. Mannava determined that the pain was related to the angioplasty, but that Plaintiff was not experiencing an acute cardiac condition. *Id.*

On January 17, 2014, Plaintiff saw Defendant Dr. Ramineni and requested Neurontin for his neuropathy. Ramineni Decl., Ex. D. Based on his evaluation of Plaintiff, Dr. Ramineni prescribed Plaintiff Neurontin, 800mg, twice daily. *Id.* On February 7, 2014, Plaintiff requested that Dr. Ramineni prescribe him Ultram for pain relief. *Id.*, Ex. E. Dr. Ramineni found that Ultram was not indicated for Plaintiff's pain symptoms. *Id.*

In February 2014, Plaintiff was transferred from Mid-State to Upstate Correctional Facility.

Pl.'s Dep. at p. 19.  Plaintiff commenced this action on October 29, 2014, asserting claims of deliberate medical indifference and retaliation against Defendants Dr. Koenigsmann, Dr. Ramieni, Dr. Mannava, Nurse Practitioner Ferguson, and Nurse Reese.  Compl.

## II.  LEGAL STANDARD

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).  "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it . . . [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*,996 F.2d at 1461.

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d

Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations,

unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Defendants seek summary judgment on the following grounds: (1) Plaintiff failed to exhaust his administrative remedies with respect to his medical indifference claims based on his chest pain, chest pressure, and heart disease; (2) Defendants are entitled to judgment as a matter of law on Plaintiff's medical indifference and retaliation claims; (3) Defendant Dr. Koenigsmann was not personally involved in any constitutional violation; and (4) Defendants are entitled to qualified immunity. Dkt. No. 31-4, Defs.' Mem. of Law. Plaintiff opposes Defendants' Motion and requests that summary judgment be entered in his favor. Dkt. No. 64-1, Pl.'s Mem. of Law. In response to Plaintiff's Cross-Motion for Summary Judgment, Defendants argue that Plaintiff's failure to provide a statement of material facts pursuant to Local Rule 7.1(a)(3) should result in denial of his Cross-Motion. Dkt. No. 69, Defs.' Reply.

### A. Defendant Dr. Koenigsmann's Personal Involvement

Plaintiff asserts claims against Defendant Dr. Koenigsmann in his capacity as Chief Medical Officer of DOCCS and supervisor of Defendants Dr. Mannava, Dr. Ramineni, Ferguson, and Reese. Compl. at ¶ 73. Plaintiff alleges that Dr. Koenigsmann failed to correct the inadequate medical care provided to Plaintiff after learning of such care through letters and grievances which Plaintiff addressed to Dr. Koenigsmann's office. *Id.* at ¶¶ 42-43 & 73. Plaintiff further alleges that Dr. Koenigsmann failed to adequately train and supervise his subordinates. *Id.* at ¶ 73.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). A supervisory official may not be held liable merely because he held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). The mere receipt of, without personally investigating, a letter from an inmate is insufficient to establish personal involvement. *Johnson v. Wright*, 234 F. Supp. 2d 352, 363-64 (S.D.N.Y. 2002) (citing cases). However, "[p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews or responds to a prisoner's complaint." *Anderson v. Ford*, 2007 WL 3025292, at *7 (D. Conn. Oct. 16, 2007). "The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009); *see also Vega v. Artus*, 610 F. Supp. 2d 195, 199 (N.D.N.Y. 2009).

In this case, it is undisputed that all of Plaintiff's correspondence addressed to Dr. Koenigsmann were referred to subordinates and not personally investigated or responded to by Dr. Koenigsmann. *See* Koenigsmann Decl. at ¶¶ 9-24. Between March 17, 2013 and February 18, 2015, Dr. Koenigsmann's office received seventeen letters from Plaintiff. Dkt. No. 31-3, Carl Koenigsmann Decl., dated Jan. 27, 2016, at ¶ 8. Dr. Koenigsmann did not personally review, investigate, or respond to any of these letters. *Id.* at ¶ 26. Instead, each of Plaintiff's letters was referred to a subordinate to investigate and prepare a response. *Id.* at ¶ 25. Therefore, Plaintiff's correspondence addressed to Dr. Koenigsmann is insufficient to establish his personal involvement. Additionally, Plaintiff's conclusory allegations that Dr. Koenigsmann failed to adequately train or

supervise his subordinates are insufficient to establish his personal involvement.

Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's claims against Defendant Dr. Koenigsmann for lack of personal involvement should be **GRANTED**.

### B. Plaintiff's Failure to Exhaust

Defendants argue that Plaintiff has failed to exhaust his administrative remedies on his claims based on Defendants' treatment of his chest pain and pressure, heart condition, and care after his angioplasty procedure in December 2013. Defs.' Mem. of Law at pp. 4-5.

### 1. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, __ S. Ct. __, 2016 WL 3128839, at *5 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL

1288679, at \*3 (E.D.N.Y. Dec. 28, 1999).[3]

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). In addition, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

### 2. *Plaintiff's Failure to Exhaust*

In support of their Motion, Defendants file the Declaration of Jeffery Hale, Assistant Director of the IGP, and the records of the grievances Plaintiff appealed to CORC. Dkt. No. 31-2, Jeffery Hale Decl., dated Jan. 15, 2016. Plaintiff filed three grievances complaining of his medical care at Mid-State: (1) Grievance No. MS-21255-13 (filed Apr. 25, 2013); (2) No. MS-21451-13 (filed Oct.

---

[3] Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999). Defendants properly raised the affirmative defense in their Answer. Dkt. No. 20 at ¶ 13.

24, 2013); and (3) No. MS-21504-13 (filed Dec. 3, 2013).[4]  *Id.* at ¶¶ 15-17.  Defendants argue that

none of Plaintiff's grievances raised complaints about Defendants' treatment of Plaintiff's chest

pain, heart condition, or care after his angioplasty procedure.  Defs.' Mem. of Law at p. 5.

Grievance No. MS-21255-13, Defendants argue, complained of Defendant Ferguson's decision to

discontinue Plaintiff's MS Contin prescription and use of a cane; No. MS-21451-13 complained of

Defendant Ferguson's decision to discontinue Plaintiff's Neurontin prescription; and No. MS-21504-

13 complained of Defendant Reese's termination of sick call.  *Id.*

"The scope of proper exhaustion under the PLRA is determined by reference to the state

grievance system's procedural rules."  *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (citing,

*inter alia*, *Jones v. Bock*, 549 U.S. 199, 218 (2007)).  The IGP regulations direct that a grievance

should contain "a concise, specific description of the problem."  N.Y. COMP. CODES R. & REGS. tit.

7, § 701.5(a)(2).  The Second Circuit has stated that this standard does not require a grievant to "lay

out the facts, articulate legal theories, or demand particular relief.  All the grievance need do is

object intelligibly to some asserted shortcoming."  *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir.

2004).  However, "[t]he benefits of exhaustion can be realized only if the prison grievance system

is given a fair opportunity to consider the grievance."  *Woodford v. Ngo*, 548 U.S. at 95.  "In order

to exhaust, therefore, inmates must provide enough information about the conduct of which they

complain to allow prison officials to take appropriate responsive measures."  *Johnson v. Testman*,

---

[4] The Court notes that in addition to his formal grievances, Plaintiff sent numerous letters complaining of his medical treatment to Defendant Koenigsmann and various outside state agencies. Dkt. Nos. 1-5 & 1-9. "[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." *Timmons v. Schriro*, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015); *see also Muhammad v. Pico*, 2003 WL 21792158, at *8 (S.D.N.Y. Aug. 5, 2003) ("District court decisions in this circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements."); *Grey v. Sparhawk*, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) ("Any complaint . . . made directly to the Inspector General's office does not serve to excuse plaintiff from adhering to the available administrative procedures.").

380 F.3d at 697. "While the PLRA does not require a legal theory of liability to be set forth in an inmate's grievance . . . the alleged *misconduct* must still be described adequately." *Murray v. Gillani*, 2013 WL 838351, at *7 (N.D.N.Y. Feb. 11, 2013).

Having carefully reviewed Plaintiff's grievances, the Court agrees with Defendants that Plaintiff did not exhaust administrative remedies on his claims that he was deprived of medical care with respect to his chest pain, heart condition, or care after his angioplasty procedure. Plaintiff's grievances concerning his medical care at Mid-State are as follows:[5]

> **MS-21255-13** (Apr. 25, 2013): Plaintiff complained that Defendant Ferguson had discontinued his MS Contin and ignored medical records that indicated that he suffered from chronic pain. Hale Decl., Exs. at p. 32.[6] Plaintiff claimed that Ferguson was refusing to provide treatment out of personal animus towards him. *Id.* Plaintiff requested effective pain medication. *Id.*
>
> **MS-21451-13** (Oct. 24, 2013): Plaintiff complained that his Neurontin prescription had been discontinued based on false accusations that he was cheeking the medication. *Id.* at p. 80. Plaintiff claimed that the medication was discontinued in retaliation for filing grievances. *Id.* Plaintiff requested that his medication be reinstated. *Id.*
>
> **MS-21504-13** (Dec. 3, 2013): Plaintiff claimed that Defendant Dr. Mannava refused to reinstate Plaintiff's Neurontin prescription. *Id.* at p. 99. Plaintiff claimed that he was being discriminated against due to his race and religion and in retaliation for having filed complaints. *Id.* at pp. 100-01. Plaintiff also alleged that Defendant Reese had refused to listen to his complaints at sick call on December 2, 2013. *Id.* at p. 102. Plaintiff requested to receive his Neurontin. *Id.* at p. 98.

Therefore, none of Plaintiff's grievances complained of the medical care he was receiving for his heart condition at Mid-State and those claims are unexhausted. *See Murray v. Gillani*, 2013 WL 838351, at *8 (the plaintiff's grievances "failed to describe the *conduct* that he is challenging in this

---

[5] Plaintiff also filed grievances at Franklin and Great Meadow Correctional Facility. Hale Decl. at ¶¶ 13 & 19-20. None of those grievances concerned his medical care at Mid-State.

[6] Because the pagination assigned by Defendants is not in order, the Court cites to the pagination assigned by the Court's Case Management Electronic Case Files ("CM/ECF") System.

action"); *Verley v. Wright*, 2007 WL 2822199, at *7 (S.D.N.Y. Sept. 27, 2007) (same); *Turner v. Goord*, 376 F. Supp. 2d 231, 325 (W.D.N.Y. 2005) (same).

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 2016 WL 3128839, at *7. As the Supreme Court recently stated, "[a]n inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at *7-8.[7] In this case, Plaintiff has pointed to no evidence in the record that would indicate that administrative remedies were unavailable to him.

Accordingly, Plaintiff's claims based on the treatment provided for his chest pain, heart condition, and care after his angioplasty procedure may be dismissed for failure to exhaust. However, because the Court also finds that these claims are subject to dismissal on the merits, the Court will recommend that they be dismissed on merits rather than for failure to exhaust.

## C. Plaintiff's Eighth Amendment Deliberate Medical Indifference Claims

---

[7] The Second Circuit previously set forth a three-part inquiry for when a failure to exhaust may be excused: "(1) administrative remedies are not available to the prisoner; (2) defendants have either wived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The Second Circuit has stated that "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Williams v. Corr. Officer Priatno*, __ F.3d __, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016).

The basis of Plaintiff's deliberate medical indifference claims are (1) that he was denied effective treatment for chronic pain symptoms resulting from several conditions, including neuropathy, a displaced lumbar disc, arthritis, and sciatic nerve damage, (2) Defendants ignored Plaintiff's complaints of shortness of breath and asthma, and (3) Defendants ignored his complaints of chest pain and pressure although he was suffering from heart disease.[8]  Compl.

### 1. Legal Standard

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.'"  *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06).  To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference.  *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

---

[8] Plaintiff has alleged that he suffered from a number of conditions—including heart disease, arthritis, high blood pressure, diabetes, neuropathy, sciatic nerve damage, a displaced lumbar disc, asthma, poor vision, and high cholesterol, *see* Compl. at ¶ 1; Pl.'s Dep. at p. 22—which Defendants address individually in their Memorandum of Law. Defs.' Mem. of Law at pp. 8-22. However, the Complaint does not make any allegations with respect to several of the conditions addressed by Defendants. Specifically, the Complaint does not allege that Defendants failed to treat Plaintiff for high cholesterol, diabetes, high blood pressure, or poor vision. Furthermore, it is undisputed that Plaintiff was prescribed medications for his high blood pressure, high cholesterol, and diabetes which he received continuously throughout his incarceration at Mid-State and Plaintiff has not specifically challenged the treatment that he received for those conditions. Defs.' SMF at ¶¶ 65-66; Pl.'s Dep. at pp. 22-23. With respect to Plaintiff's poor vision, Plaintiff complains that he never received eyeglasses that he had ordered at Franklin. Pl.'s Dep. at p. 51. It is undisputed, though, that the Defendants at Mid-State had no control over the ordering or shipment of Plaintiff's eyeglasses. Mannava Decl. at ¶ 13. The Court therefore will not separately discuss Plaintiff's high cholesterol, high blood pressure, diabetes, and poor vision. The Court will discuss Plaintiff's neuropathy, displaced lumbar disc, sciatic nerve damage, and arthritis together because Plaintiff's claim based on these conditions is that Defendants failed to adequately treat his chronic pain symptoms.

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). A court must consider two inquiries in determining whether a deprivation of care is sufficiently serious. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). First, the court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is adequate where the care provided is a "reasonable" response to the inmate's medical condition. *Id.* The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where there is a failure to provide any treatment, the court examines whether the inmate's medical condition is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). In cases where medical treatment is given, but is inadequate, "the seriousness inquiry is narrower." *Salahuddin v. Goord*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Id.* (quoting *Smith v. Carpenter*, 316 F.3d at 185).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the

defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

## 2. Analysis

### a. Chronic Pain

Plaintiff suffers from neuropathy, a displaced lumbar disc, sciatic nerve damage, and arthritis, all of which contribute to his chronic pain symptoms. During his incarceration at Mid-State, Plaintiff was seen in sick call and by his physician for complaints of body-wide pain, lower back pain, pain radiating down his sciatic nerve, abdominal pain, foot pain, headaches, numbness and tingling, and difficulty ambulating and controlling his legs. *See, e.g.*, Mannava Decl. at ¶¶ 5, 12, & 14-15; Reese Decl. at ¶ 13. With respect to his deliberate indifference claims, Plaintiff generally alleges that Defendants ignored his complaints of pain at numerous sick call visits. In particular, Plaintiff alleges that (1) Defendant Ferguson discontinued his prescription for MS Contin

and the other Defendants refused to reinstate it or other effective pain medication, (2) Ferguson confiscated his cane and replaced it with a back brace that did not fit, and (3) Defendants suspended, and then discontinued, his Neurontin prescription. *See* Compl. at ¶¶ 4, 11, & 45.

The Court first notes that, contrary to Plaintiff's claims, Defendants did provide Plaintiff with on-going treatment for his pain symptoms. As far as pain medication, Plaintiff was prescribed Neurontin, 800mg, three times daily, when he arrived at Mid-State. He received this prescription until it was discontinued in October 2013. Later, Plaintiff was also prescribed Naproxen, 500mg, twice daily. Plaintiff was also frequently seen for sick call and in the infirmary, and received physical examinations of his feet and legs, bloodwork for his abdominal pain, and neurological testing for his complaints of headaches, numbness, and tingling. As to Plaintiff's back pain, Plaintiff was provided with a back brace. The issue then under the objective prong of the Eighth Amendment analysis is whether Plaintiff was actually deprived of adequate medical care, and if so, whether the inadequacy was sufficiently serious.[9] *See Salahuddin v. Goord*, 467 F.3d at 279. The Court must then consider, under the subjective prong, whether the claimed deprivations evidence deliberate indifference.

### i. MS Contin

First, as to Plaintiff's claim based on Defendants' decision to discontinue his MS Contin prescription and refusal to prescribe Ultram, it is well established that "[d]ifferences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs." *Wright*

---

[9] The Court notes that Defendants have not argued in their Memorandum of Law that Plaintiff's neuropathy, sciatic nerve damage, displaced disc, and arthritis did not constitute serious medical conditions. *See* Defs.' Mem. of Law at pp. 7-8.

*v. Genovese*, 694 F. Supp. 2d 137, 160 (N.D.N.Y. 2010). Here, Defendant Ferguson discontinued Plaintiff's MS Contin prescription because it is a narcotic pain reliever that is used to treat acute episodes of pain. Ferguson Decl. at ¶ 9. In her medical opinion, MS Contin was not an appropriate treatment for Plaintiff's chronic pain symptoms because it could be "highly addictive, habit forming, and cause serious side effects." *Id.* Instead, Ferguson prescribed Plaintiff Neurontin and, on April 23, 2013, Naproxen to treat his chronic pain symptoms. *Id.* at ¶¶ 6 & 10. Plaintiff continuously received those medications while incarcerated at Mid-State, although his Neurontin prescription was later discontinued, which the Court will discuss separately below. *Id.* at ¶ 7; Pl.'s Dep. at p. 108. On June 27, 2013, Ferguson denied Plaintiff's request for Ultram, determining that it was contraindicated due to Plaintiff's previous complaints of headaches and possible seizures. Ferguson Decl. at ¶ 13; *see also* Ramini Decl. at ¶ 15 (explaining that Ultram can lower the threshold for experiencing seizures). Defendants Dr. Mannava and Dr. Remini agreed with Ferguson's determination that Plaintiff's chronic pain was appropriately treated with Neurontin and Naproxen. Mannava Decl. at ¶¶ 5-6, 12, & 14-16; Remini Decl. at ¶ 6 & 8. Defendant Reese had no authority to prescribe medication to inmates. Reese Decl. at ¶ 8.

Defendants evaluated Plaintiff's symptoms and determined that they were appropriately treated with Neurontin and Naproxen, and that MS Contin and other narcotics were not indicated. Defendants' decision to treat Plaintiff's chronic pain with Neurontin and Naproxen, and to discontinue his prescription for MS Contin and deny his request for Ultram was a medical judgment which does not evidence deliberate indifference. "[D]isagreements over medications . . . implicate medical judgments and not the Eighth Amendment." *Wright v. Genovese*, 694 F. Supp. 2d at 155 (citing *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001)).

The decision not to prescribe stronger pain medication does not evidence deliberate indifference. *Vail v. Lashway*, 2014 WL 4626490, at *14 (N.D.N.Y. Sept. 15, 2014) ("[T]he decision to choose one form of pain medication over another . . . is not indicative of deliberate indifference."); *Scott v. Perio*, 2005 WL 711884, at *6 (W.D.N.Y. Mar. 25, 2005); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (finding that inmate's claim that medical providers should have prescribed stronger pain medication than Tylenol did not state deliberate indifference claim). Furthermore, "concern about prescribing narcotic pain medication, on which inmates . . . could become dependent, may inform a medical judgment about what drugs to prescribe." *Wright v. Genovese*, 694 F. Supp. 2d at 160. Accordingly, Plaintiff's disagreement with Defendants' decision to discontinue Plaintiff's MS Contin prescription and to deny Plaintiff's requests for other narcotic pain medications does not establish a claim for deliberate indifference.

*ii. Neurontin*

However, as to Plaintiff's claim based on Defendants' decision to discontinue his Neurontin prescription, the Court reaches a different outcome. Plaintiff's neuropathy causes tingling, numbness, and sharp pain in his arms and legs. Pl.'s Dep. at pp. 31-32. Plaintiff takes Neurontin to treat his neuropathy; Neurontin helps ease the tingling, numbness and pain. *Id.* at p. 31. Neurontin is also prescribed to relieve Plaintiff's chronic pain from his displaced lumbar disc and sciatic nerve damage. Ferguson Decl. at ¶ 6. Plaintiff was prescribed Neurontin upon his admission to Mid-State. *Id.* On October 21, 2013, Defendant Ferguson discontinued Plaintiff's Neurontin prescription after being informed that Plaintiff had been misusing his Neurontin by cheeking it. *Id.*

at ¶ 19. This decision was affirmed by Defendant Dr. Mannava.[10] Mannava Decl. at ¶ 14. Plaintiff suffered withdrawals and worsening pain. Pl.'s Dep. at p. 134. Plaintiff also claims that he had difficulty walking. *Id.* at pp. 129-32. Plaintiff's medical records show that he appeared at sick call several times after the discontinuance of his Neurontin prescription complaining of body-wide pain, pain and numbness in his feet, and difficulty walking. *See, e.g.*, Mannava Decl., Exs. I, J, & K; Reese Decl., Ex. F. Plaintiff's testimony as to the chronic pain and difficulty ambulating he experienced as a result of the interruption of his Neurontin prescription is sufficient to establish a genuine issue of material fact as to whether the interruption constituted a "sufficiently serious" deprivation of adequate care. *See Chance v. Armstrong*, 143 F.3d at 702.

Defendants assert that the interruption of Plaintiff's Neurontin prescription does not evidence deliberate indifference because Plaintiff had been caught misusing the prescription. Defs.' Mem. of Law at p. 14. Defendant Ferguson states that she discontinued Plaintiff's prescription for several reasons: (1) a patient's misuse of a medication poses a health risk to the patient; (2) a patient's misuse of a medication poses a risk to the security of the facility and the health of other inmates if the patient were to attempt to sell the medication to other inmates; (3) a patient's misuse of a medication indicates that the patient may not actually need the medication; (4) Ferguson was aware that Plaintiff had a history of cheeking medications; and (5) Plaintiff had been prescribed other medications to treat his chronic pain. Ferguson Decl. at ¶ 19. Defendants therefore argue that the decision to discontinue Plaintiff's Neurontin prescription was a medical judgment and that Plaintiff's claim is nothing more than a non-actionable disagreement over the appropriate course of treatment. Defs.' Mem. of Law at p. 15.

---

[10] Neither Defendant Dr. Ramineni nor Defendant Reese was involved in discontinuing Plaintiff's Neurontin prescription. *See* Ramineni Decl.; Reese Decl. at ¶ 8.

Plaintiff disputes that he cheeked the Neurontin. Specifically, Plaintiff claims that it was impossible for him to cheek the medication because the Neurontin was crushed and dissolved in water. Pl.'s Dep. at pp. 137-38. Plaintiff instead claims that Ferguson discontinued the prescription in retaliation for Plaintiff filing grievances against her. *Id.* at p. 138. The Court agrees with Plaintiff that there is a disputed issue of material fact as to whether Defendants discontinued Plaintiff's Neurontin prescription pursuant to a medical judgment or based on other, non-medical reasons. In this regard, the Court notes that Plaintiff's medical records support his contention that his Neurontin was crushed and dissolved in water. Ferguson Decl., Exs. C & E; Mannava Decl., Ex. D. Defendants do not address or explain how it was possible for Plaintiff to cheek a medication that was dissolved in water. Therefore, the Court cannot determine whether Defendants' decision "was the product of sound medical judgment, negligence, or deliberate indifference." *Chance v. Armstrong*, 143 F.3d at 703. There is a disputed issue of a material fact as to whether Defendants' decision to discontinue Plaintiff's Neurontin prescription "was an act of retribution rather than a medical judgment" and thus, whether Defendants acted with deliberate indifference. *Funderburke v. Canfield*, 2016 WL 831974, at *8 (W.D.N.Y. Feb. 29, 2016) (finding issues of material fact on both the objective and subjective prongs of the plaintiff's Eighth Amendment where the defendants discontinued the plaintiff's Neurontin prescription due to alleged cheeking).

### ii(a). Qualified Immunity

Defendants have raised qualified immunity as an affirmative defense. Defs.' Mem. of Law at pp. 31-32. In light of its finding that there is a disputed issue of material fact as to whether Defendants acted with deliberate indifference in discontinuing Plaintiff's Neurontin prescription, the Court considers in the alternative whether Defendants would be entitled to qualified immunity

on that claim. The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Lewis v. Cowan*, 165 F.3d 154, 166 (2d Cir. 1999). In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court set forth a two-pronged approach to the qualified immunity analysis whereby a court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194 at 201-02; *but see Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[W]e now hold that the *Saucier* protocol should not be regarded as mandatory in all cases."). To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "(1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her actions were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). Here, the Court finds that Defendants are not entitled to qualified immunity at this stage. First, "the right to be free from deliberate indifference to serious medical needs" was clearly established at the time of the events of this action. *LaBounty v. Coughlin*, 137 F.3d 68, 74 (2d Cir. 1998) (citing *Estelle v. Gamble*, 429 U.S. at 104). Second, due to the factual disputes, the Court cannot conclude as a matter of law that it would have been

objectively reasonable for Defendants to believe that they were not violating Plaintiff's rights.

### iii. Remaining Claims

The Court finds that Defendants are entitled to summary judgment with respect to Plaintiff's remaining claims based on Defendants' treatment of his chronic pain symptoms. In addition to his claim based on the discontinuation of his Neurontin prescription, Plaintiff also asserts a claim based on an earlier incident where Defendant Ferguson reduced his prescription from 800mg, three times daily, to 800mg, twice daily. Plaintiff's prescription was reduced on May 9, 2013, because he was moved to SHU and nurses only make rounds in SHU twice a day. Ferguson Decl. at ¶ 11. Ferguson determined that Plaintiff's medication could safely be reduced from three times a day to two times a day. *Id.* On June 27, 2013, after Plaintiff was out of SHU, Defendant Ferguson returned Plaintiff's prescription to three times a day. *Id.* at ¶ 13. As to the objective prong, Plaintiff fails to show that the reduction of his Neurontin prescription was sufficiently serious. Plaintiff does not allege any specific harm caused by the reduction of his prescription. *See Price v. Reilly*, 697 F. Supp. 2d 344, 359 (E.D.N.Y. 2010) ("Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious health risk to plaintiff's health."). Furthermore, this claim is a mere disagreement over a course of treatment and does not amount to deliberate indifference. *See id.* at 360 ("[M]ere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference."); *Wright v. Genovese*, 694 F. Supp. 2d at 155.

Plaintiff also asserts a claim based on Defendant Ferguson's decision to replace his cane with a back brace. Plaintiff claims that his cane was the "perfect height" and that he had "no problem" walking with it. Pl.'s Dep. at p. 97. On the other hand, Plaintiff claims that he never received a back

brace that fit. *Id.* at p. 95. Here, the record demonstrates that Plaintiff was not actually deprived of adequate medical care. Ferguson recorded that Plaintiff stated his cane was too short and that he requested a back brace. Ferguson Decl., Ex. B. Later, when Plaintiff stated that his back brace was too small, Ferguson noted that she would ask the nurse administrator about ordering a larger back brace. *Id.*, Ex. E. Plaintiff alleges that he requested his cane back, Compl. at ¶¶ 34 & 44, but there is no note of such requests in Plaintiff's medical records, Ferguson Decl., Ex. F; Mannava Decl., Ex. H. Even if Plaintiff could show that replacement of his cane with a back brace was a deprivation of adequate care, he would not be able to show that it evidenced deliberate indifference. Plaintiff's claim based on the replacement of cane is a "mere disagreement over the proper treatment." *Chance v. Armstrong*, 143 F.3d at 703.

Accordingly, as to Plaintiff's claim based on Defendant Ferguson's and Dr. Mannava's discontinuance of his Neurontin, the Court recommends that Defendants' Motion and Plaintiff's Motion be **DENIED** due to disputed issues of material fact. However, as to Plaintiff's other claims based on Defendants' treatment of his chronic pain symptoms, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Cross-Motion be **DENIED**.

### b. Heart Disease

The Court next considers whether Plaintiff has established a deliberate medical indifference claim as to Defendants' treatment of his heart disease. As revealed by Plaintiff's hospital visit in December 2013, Plaintiff suffers from significant coronary disease. Hummel Affirm., Ex. F. at pp. 51-52. Plaintiff had multiple risk factors for heart disease, including diabetes, hypertension, hyperlipidemia, smoking, and family history. *Id.* at p. 20. Plaintiff claims that he suffered from

recurrent chest pain throughout his incarceration at Mid-State which Defendants ignored and attributed to anxiety.  Pl.'s Mem. of Law at p. 26.

Plaintiff alleges that he complained to Defendants of chest pain and pressure on numerous occasions from April until December 2013.  *See* Compl.  Defendants, on the other hand, claim that Plaintiff did not complain to any of them of chest pain or pressure prior to December 11, 2013, the date that Plaintiff was sent to St. Luke's.  Defs.' Mem. of Law at p. 19.  Plaintiff's medical records support Defendants' assertion.  Although Plaintiff's medical records reflect that he saw Defendants numerous times with various complaints, there is no record that Plaintiff complained of chest pains prior to December 11, 2013.  Plaintiff alleges that he saw Defendant Ferguson on April 23, June 10, June 27, July 15, and August 30, 2013 and complained of chest pains and pressure on each occasion.  Compl. at ¶¶ 11, 25, 28, 34, & 39.  However, while Plaintiff's medical records reveal that he saw Ferguson on those dates, there is no mention of any complaint of chest pain on any of those dates.  Ferguson Decl., Exs. B, D, E, F, & G.  Plaintiff similarly alleges that he complained of chest pain to Defendant Reese on April 8, August 19, and September 3, 2013; and to Defendant Dr. Mannava on May 16, October 3, October 28, and November 14, 2013.  Compl. at ¶¶ 5, 19, 38, 41, 44, 52, & 54.  Again, Plaintiff's medical records for those dates do not mention any complaint of chest pain to those Defendants.  Mannava Decl., Exs. B, H, I, & J; Reese Decl., Exs. A, D, & E.

Indeed, the only records of Plaintiff complaining of chest pain prior to December 11, 2013, were made to Mid-State staff who are not Defendants in this action.  On May 8, 2013, Plaintiff complained of chest pressure and was admitted to the infirmary.  Hummel Affirm., Ex. B.  An outside physician was contacted by telemedicine and an EKG was performed, which did not show any signs of acute distress.  *Id.*  Plaintiff was seen by Defendants Dr. Ramineni and Reese the

following day, but did not complain of chest pain at that time, and instead complained of back pain and requested stronger pain medication. Ramineni Decl. at ¶ 6; Reese Decl. at ¶ 10. Plaintiff also complained of chest pain on May 17, May 20, July 12, and August 18, 2013; however, none of those complaints were made to Defendants. Pl.'s Exs. at A-11, A-12, A-14, & A-16. On each occasion, Plaintiff was examined and determined not to be in acute distress. *Id.*

Thus, there is no evidence that Plaintiff complained directly to any of the Defendants of chest pains prior to December 11, 2013. Furthermore, there is nothing that indicates that any of the Defendants were otherwise aware that Plaintiff's chest pains posed a substantial risk to him and disregarded such risk, as would be required to support a deliberate indifference claim.[11]

As to the treatment he received in December 2013, Plaintiff cannot establish either that he was deprived of adequate care, at the objective prong, or that any of Defendants acted with deliberate indifference. On December 11, 2013, Plaintiff complained of chest pain and pressure. Ferguson Decl., Ex. J. Defendant Ferguson ordered that an EKG be performed, which showed an artial flutter, indicating that Plaintiff's heart was functioning abnormally. *Id.* at ¶ 20. Ferguson then ordered that Plaintiff be sent to St. Luke's Hospital for further evaluation. *Id.* At St. Luke's, a stress echocardiogram was performed which was negative for ischemia, and it was thought likely that Plaintiff's symptoms were non-cardiac in origin. Hummel Affirm., Ex. E. On December 13, Plaintiff returned to Mid-State. Ferguson Decl. at ¶ 22. On December 14, Plaintiff again experienced chest pain and was sent back to St. Luke's. Hummel Affirm., Ex. F. None of the

---

[11] Notably, while a diagnosed heart condition may constitute a serious medical condition, *Bruno v. Wright*, 2008 WL 5100278, at *6 (N.D.N.Y. Nov. 26, 2008), district courts in the Second Circuit have held that chest pains alone do not constitute a sufficiently serious medical condition, *Kidkarndee v. Koenigsmann*, 2014 WL 1239319, at *15 (N.D.N.Y. Mar. 25, 2014); *Young-Flynn v. Wright*, 2007 WL 241332, at *19 (S.D.N.Y. Jan. 26, 2007); *Hutchinson v. New York State Corr. Officers*, 2003 WL 22056997, at *5 (S.D.N.Y. Sept. 4, 2003).

Defendants saw Plaintiff on this date or were involved in the decision to return him to St. Luke's. Ferguson Decl. at ¶ 24; Mannava Decl. at ¶ 19; Reese Decl. at ¶ 18; Ramineni Decl. at ¶ 11. At St. Luke's, a cardiac catherization was performed, which revealed significant coronary disease. Hummel Affirm., Ex. G. An angioplasty was recommended, and the procedure was performed on December 17, 2013, with the placement of two stents in Plaintiff's left coronary artery. *Id.*

Plaintiff returned to Mid-State on December 18 and was seen by Ferguson. Ferguson Decl. at ¶ 26. Consistent with the discharge orders of his physicians at St. Luke's, Ferguson prescribed Plaintiff Plavix, 75mg once a day. *Id.* She also ordered that nursing staff check Plaintiff's vital signs, and examine and clean the site of Plaintiff's wound three times a day for forty-eight hours. *Id.* On December 19, 2013, Plaintiff was evaluated by Defendant Dr. Mannava, who found that the angioplasty had completely relieved Plaintiff's symptoms of chest pain and that he was medically stable. Mannava Decl., Ex. L. Dr. Mannava again saw Plaintiff on December 29, after Plaintiff complained of chest pain. *Id.*, Ex. M. Dr. Mannava examined Plaintiff and determined that the chest pain was non-cardiac and was caused by the placement of the stents. *Id.* at ¶ 22.

As these undisputed facts show, neither Defendant Ferguson nor Defendant Dr. Mannava deprived Plaintiff of adequate medical care or acted with deliberate indifference towards Plaintiff's heart condition in December 2013. In addition, it is undisputed that Defendants Ramineni and Reese were not involved in the treatment of Plaintiff's heart condition at that time. Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Cross-Motion be **DENIED** as to Plaintiff's deliberate indifference claim based on the treatment provided for his complaints of chest pain.

*c. Shortness of Breath/Asthma*

Plaintiff alleges that Defendants repeatedly ignored his complaints of shortness of breath. However, the record again shows that the Defendants neither deprived Plaintiff of adequate care nor were deliberately indifferent with regard to Plaintiff's complaints of shortness of breath and asthma.

"Difficulty breathing due to asthma may be a serious medical condition, depending on the severity of the asthma attack." *Flemming v. Velardi*, 2003 WL 21756108, at *2 (S.D.N.Y. July 30, 2003); *see also Patterson v. Cecot*, 2011 WL 4343842, at *4 (N.D.N.Y. Mar. 8, 2011) (noting that courts generally distinguish between the condition of being asthmatic, which is not a serious medical condition, and suffering an actual asthma attack, which may be a serious medical condition). Plaintiff's medical records indicate that he complained of shortness of breath to Defendants on May 1, May 8, May 10, July 15, and July 18. Pl.'s Exs. at A-7; Reese Decl., Ex. B; Mannava Decl., Exs. A & E; Ferguson Decl., Ex. F. In each instance, contrary to Plaintiff's claims that Defendants ignored his complaints, Defendants provided treatment to Plaintiff. When Plaintiff suffered an attack on May 1, Defendant Dr. Mannava examined Plaintiff and noted difficulty breathing, but no wheezing. Pl.'s Exs. at A-7. Dr. Mannava concluded that Plaintiff had intermittent mild asthma and prescribed him Albuterol. *Id.* During subsequent attacks, Defendants listened to Plaintiff's lungs for air movement and signs of wheezing; at no time was Plaintiff noted to be in distress. Reese Decl., Ex. B; Mannava Decl., Exs. A & E; Ferguson Decl., Ex. F. When Plaintiff ran out of Albuterol, Defendant Ferguson ordered a new supply for him. Ferguson Decl., Ex. F. Plaintiff acknowledges that he was never denied Albuterol while he was at Mid-State. Pl.'s Dep. at p. 55. Plaintiff does not allege any medical treatment that he was denied with respect to his asthma attacks; instead Plaintiff merely claims that his "medical complaints of [his] asthma [were not taken] seriously." *Id.* Plaintiff therefore has not established that he was deprived of adequate treatment

at the objective prong.

For the same reasons, the record is insufficient to establish that any Defendant acted with deliberate indifference towards Plaintiff's asthma attacks. To the extent Plaintiff disagrees with Defendants' treatment of his asthma attacks, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d at 703.

Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Cross-Motion for Summary Judgment be **DENIED** as to Plaintiff's deliberate indifference claim based on the treatment he received for his asthma.

### D. Plaintiff's Retaliation Claims

Plaintiff asserts retaliation claims against Defendants as follows: (1) Defendant Reese filed misbehavior reports against Plaintiff in retaliation for Plaintiff seeking medical care; (2) Defendant Ferguson discontinued Plaintiff's prescriptions for MS Contin and Neurontin and filed a misbehavior report against Plaintiff in retaliation for Plaintiff filing grievances against her; and (3) Defendants Dr. Mannava and Dr. Ramineni denied Plaintiff medical care in retaliation for Plaintiff filing grievances against other Defendants. Compl. at ¶¶ 75-78 & 82.

#### 1. Legal Standard

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). "Only

retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493.

The plaintiff bears the initial burden in showing that "that the protected conduct was a substantial or motivating factor" for the defendant's actions. *Graham v. Henderson*, 89 F.3d at 79. To satisfy the causal connection prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) the prisoner's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. Direct evidence is not required and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia*, *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir. 1994)); *see also Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (stating that a defendant may successfully meet this burden by demonstrating that the "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report").

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872

(citation omitted); *Dawes v. Walker*, 239 F.3d at 491 ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

### 2. *Defendant Reese*

Plaintiff asserts claims against Defendant Reese for allegedly retaliating against him for seeking medical care by filing misbehavior reports on May 9 and December 2, 2013. Compl. at ¶ 77. On December 2, Plaintiff claims that Reese stated that she would file a misbehavior report against him if he complained of his chronic conditions; when Plaintiff continued to complain of chronic conditions, Reese filed a misbehavior report against him. Pl.'s Mem. of Law at pp. 34-35. Plaintiff alleges that he received time in SHU as a result of these misbehavior reports. Compl. at ¶ 77. Defendants argue that Reese has rebutted any inference of retaliatory motive by her explanation that the misbehavior reports were filed against Plaintiff due to his argumentative and threatening behavior during sick call. Defs.' Mem. of Law at pp. 24-25.

The Court first notes that it is questionable whether Plaintiff can establish a *prima facie* case of retaliation. As to the first prong, it appears uncertain whether an inmate's request for medical attention is protected conduct under the First Amendment. *See Brown v. White*, 2010 WL 985184, at *12 (N.D.N.Y. Mar. 15, 2010) (stating that "[t]he court has found no Supreme Court authority as to whether the First Amendment confers upon a prisoner the right to demand necessary medical attention and courts in the Second Circuit have not decided the issue"); *Maxwell v. City of New York*, 272 F. Supp. 2d 285, 299 (S.D.N.Y. July 10, 2003) (stating that an inmate's requests for medical attention are "not the typical protected speech most commonly considered protected"), *aff'd in part,*

*vacated in part on other grounds*, 380 F.3d 106 (2d Cir. 2004); *Benitiz v. Pacenco*, 1995 WL 444352, at *5 (S.D.N.Y. July 27, 1995) (stating that it is doubtful that "an inmate has a constitutional right to 'repeatedly' complain about his medical aliments"). Second, as to whether Plaintiff suffered an adverse action, the record is undeveloped in several key respects. Specifically, there is nothing that indicates whether the misbehavior reports against Plaintiff were dismissed or whether a disciplinary hearing was held. *See* N.Y. COMP. CODES R. & REGS. tit. 7, § 251-2(b), (c). Furthermore, there is no evidence of whether Plaintiff was found guilty of the misconduct charged and whether a penalty was imposed on Plaintiff, although Plaintiff alleges that he was placed in SHU. Compl. at ¶ 77.

Defendants, however, do not argue that Plaintiff has failed to establish protected conduct or an adverse action. Instead, Defendants' sole argument is that Defendant Reese has rebutted any inference of retaliatory motive in the misbehavior reports she filed against Plaintiff. *See* Defs.' Mem. of Law at pp. 24-25. Therefore, assuming that Plaintiff was engaged in protected conduct and suffered an adverse action, the Court will turn to Defendants' argument that Plaintiff has not established a causal connection between his requests for medical attention and the misbehavior reports issued by Defendant Reese. While the Court agrees with Defendants as to the May 9, 2013 incident, it disagrees as to the December 2, 2013 incident.

With respect to the May 9 incident, Plaintiff's sole evidence that the misbehavior report was issued in retaliation for his requests of medical attention is temporal proximity. Plaintiff does not allege that Reese made any statements regarding her motive for issuing the misbehavior reports, nor is there any evidence that the misbehavior reports were dismissed. A retaliation claim based on such thin evidence may fail at summary judgment. *See Gill v. DeFrank*, 2000 WL 270854, at *16

(S.D.N.Y. Mar. 9, 2000) ("While the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment."). However, the Court also finds that Reese has rebutted any inference that she acted out of a retaliatory motive. Reese, in her sworn declaration, states that she did not issue the misbehavior report to retaliate against Plaintiff for seeking medical attention. Reese Decl. at ¶ 10. Rather, according to the misbehavior report, Plaintiff became highly argumentative and threatening when notified that he was being discharged, and only left when a correctional officer responded. *Id.*, Ex. C. The Court therefore agrees with Defendants that Plaintiff has failed to establish that Reese acted out of retaliatory motive in issuing him the May 9 misbehavior report.

As to the December 2 incident, on the other hand, Plaintiff alleges that Defendant Reese stated that she would issue him a misbehavior report if he complained of his chronic conditions; when he sought treatment for those conditions, Reese issued him the misbehavior report. Plaintiff verified his Complaint by attesting under the penalty of perjury that the statements contained therein were true. *Colon v. Coughlin*, 58 F.3d at 872. "A verified complaint is to be treated as an affidavit for summary judgment purposes . . . provided it meets the other requirements for an affidavit under Rule 56(e)." *Id.* The Court finds that Plaintiff's allegations are sufficient to create a genuine issue of material fact as to whether Reese was substantially motivated by retaliation in issuing the December 2 misbehavior report against Plaintiff. Reese again states under oath that she issued the misbehavior report because of Plaintiff's argumentative and threatening conduct, not to retaliate against Plaintiff for seeking medical attention. Reese Decl. at ¶ 16. However, while a defendant may meet their burden of justification by demonstrating that the plaintiff "committed the most

serious, if not all, of the prohibited conduct charged in the misbehavior report," *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998), here there is no evidence before the Court that Plaintiff committed the misconduct charged. *See Rivera v. Lawrence*, 2009 WL 1734735, at *6 (N.D.N.Y. June 18, 2009) (finding that the defendant "ha[d] not met his burden of establishing that he would have filed the misbehavior report even in the absence of the protected conduct" because it was "disputed whether Plaintiff committed the prohibited conduct"). Indeed, the only evidence relevant to whether retaliation was a substantial motivating factor in Reese's filing of the December 2 misbehavior report are Plaintiff and Reese's sworn statements. The disparity between these statements presents a credibility issue that is not appropriately resolved by the Court on summary judgment. *See Colon v. Coughlin*, 58 F.3d at 873.

Nonetheless, the Court finds that Defendant Reese is entitled to summary judgment on the grounds of qualified immunity because there is no "clearly established right" under the First Amendment for inmates to request medical attention. As stated above, the Court is aware of no authority holding that a inmate's request for medical attention is protected conduct under the First Amendment. *See Brown v. White*, 2010 WL 985184, at *12; *Maxwell v. City of New York*, 272 F. Supp. 2d at 300; *Benitiz v. Pacenco*, 1995 WL 444352, at *5; *but see West v. McCaughtry*, 971 F. Supp. 1272, 1277 (E.D. Wisc. 1997) ("If a prisoner were disciplined solely because of his requests for proper medical treatment, it would surely be a constitutional violation."). The Court need not decide whether the First Amendment protects an inmate's requests for medical attention because it is evident that there was no such "clearly established right" when Reese issued Plaintiff the misbehavior report on December 2, 2013. *See Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 429 n.9 (2d Cir. 2009) (stating that after *Pearson v. Callahan*, 555 U.S. 223 (2009),

"a district court does not necessarily err in addressing a qualified immunity issue by concluding that a right is not clearly established at the time of a government officials' actions, without first deciding whether those officials could reasonably viewed as violating that right").

To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "(1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her actions were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). Here, neither the Second Circuit nor the Supreme Court has held that the First Amendment protects an inmate's requests for medical attention. *See Brown v. White*, 2010 WL 985184, at *15. Thus, "[a] reasonable state employee in the defendant's position would not have understood that her acts on [December 2, 2013] might have unlawfully abridged the First Amendment rights of [Plaintiff]." *Id.*

The Court therefore recommends that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Cross-Motion be **DENIED** as to Plaintiff's retaliation claims against Defendant Reese.

### 3. Defendant Ferguson

Plaintiff next asserts claims against Defendant Ferguson alleging that she discontinued his prescriptions for MS Contin, a cane, and Neurontin in retaliation for Plaintiff filing grievances against her. Compl. at ¶ 78. Plaintiff also alleges that Ferguson issued a misbehavior report against him for seeking medical attention on August 30, 2013. *Id.* at ¶ 39.

The Court first discusses Plaintiff's claim that Defendant Ferguson retaliated against him for filing grievances by discontinuing certain of his medications. Plaintiff's contention that Ferguson

retaliated against him for filing grievances satisfies the first prong because "[i]t is well-settled that the filing of a prison grievance is a protected activity." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010); *see also Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[Plaintiff] has sufficiently alleged . . . participation in a protected activity: the use of the prison grievance system."); *Colon v. Coughlin*, 58 F.3d at 872 ("Prisoners . . . have a constitutional right . . . to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right.").

As to the second prong, "it is plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prisoner doctor." *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. Oct. 13, 2009). The Court found above that there is a genuine issue of material fact as to whether the discontinuation of Plaintiff's Neurontin prescription deprived him of adequate medical care; therefore, to the extent that Plaintiff claims his Neurontin prescription was discontinued in retaliation for filing grievances, he has established that he suffered an adverse action. *See supra* Part II.C.2.a. However, the Court has found above that there is no evidence that Plaintiff was deprived of adequate medical care as to the discontinuation of his MS Contin prescription and use of a cane. *See id.* A retaliation claim that asserts a deprivation of a medical care as the adverse action suffered should be dismissed if it is established that there was no deprivation of medical care. *See Vail v. Lashway*, 2014 WL 4626490, at *19 (N.D.N.Y. Sept. 15, 2014); *Tatta v. Wright*, 616 F. Supp. 2d 308, 320 (N.D.N.Y. 2007). Therefore, Plaintiff's retaliation claims based on the discontinuation of his MS Contin prescription and use of a cane could be dismissed on this ground.

However, Plaintiff's retaliation claims are also subject to dismissal because he has failed to

establish a causal connection between the grievances he filed and Defendant Ferguson's decisions to discontinue his MS Contin on April 5, his cane on April 23, and his Neurontin on October 24, 2013. First, Plaintiff cannot establish that Ferguson discontinued his MS Contin and use of cane in retaliation for filing grievances against her because Plaintiff's first grievance filed against her was on April 25, 2013. Hale Decl., Exs. at p. 32. The alleged adverse action cannot be retaliatory where it predated the protected conduct. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 368 (S.D.N.Y. 2011). Second, there is no evidence that Ferguson discontinued Plaintiff's Neurontin prescription on October 21,2013 in retaliation for the April 25, 2013 grievance, apart from temporal proximity.[12] The Second Circuit has held that a passage of only six months between the protected conduct and the retaliatory action is sufficient to support an inference of a causal connection. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). However, the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and allegedly retaliatory act." *Id.* (quoting *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001)). Nonetheless, even assuming that the six months between when Plaintiff filed the grievance in April 2013 and Ferguson discontinued his Neurontin in October 2013 created an inference of retaliation, without further evidence of retaliatory motive, Plaintiff's claim is insufficient to survive summary judgment. *See Ayers v. Stewart*, 1996 WL 346049, at *1 (2d Cir. June 25, 1996); *Roseboro v. Gillespie*, 791 F. Supp. 2d at 370; *Williams v. Goord*, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000); *Gill v. DeFrank*, 2000 WL 270854, at *16.

---

[12] In addition to Plaintiff's formal Grievance No. MS-21255-13 filed on April 25, 2013, Plaintiff also sent numerous other letters complaining of his treatment to Defendant Koenigsmann and various state agencies. *See* Dkt. Nos. 1-5 & 1-9. However, there is nothing in the record to suggest that Defendant Ferguson was aware of these informal letters and complaints, other than Plaintiff's conclusory statements. *See* Pl.'s Dep. at p. 165.

As to Plaintiff's claim that Defendant Ferguson retaliated against him for seeking medical attention on August 30, 2013, for the same reasons discussed above in connection with Plaintiff's retaliation claims against Defendant Reese, the Court finds that Ferguson is entitled to summary judgment on the grounds of qualified immunity because there is no "clearly established right" under the First Amendment for inmate's to request medical attention.

Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Cross-Motion be **DENIED** as to Plaintiff's retaliation claims against Defendant Ferguson.

### 4. Defendants Dr. Mannava and Dr. Ramineni

Plaintiff asserts claims against Defendants Dr. Mannava and Dr. Ramineni for allegedly denying him medical care in retaliation for filing grievances and making complaints against Mid-State's medical staff. Compl. at ¶ 76.

As discussed above, the filing of grievances is protected conduct. *Mateo v. Fischer*, 682 F. Supp. 2d at 433. With respect to the second prong, Plaintiff's retaliation claims against Defendant Dr. Ramineni should be dismissed because he has not shown that Dr. Ramineni denied him adequate medical care. Thus, Dr. Ramineni did not cause Plaintiff adverse action in any respect. *See Vail v. Lashway*, 2014 WL 4626490, at *19. However, as to Defendant Dr. Mannava, the Court has found above that there is a genuine issue of material fact as to whether Dr. Mannava denied Plaintiff adequate medical care in affirming the discontinuation of his Neurontin prescription. Thus, based on the discontinuation of his Neurontin prescription, Plaintiff has satisfied his burden on the second prong for his retaliation claim against Dr. Mannava. As to the third prong, Plaintiff has not shown any causal connection between his protected activity and the adverse action Dr. Mannava allegedly

committed against him.  Plaintiff filed a grievance against Defendant Ferguson for discontinuing his Neurontin prescription on October 24, 2013, which was in addition to his earlier grievance filed against her on April 25, 2013 for discontinuing his MS Contin and use of a cane, Hale Decl., Exs. at pp. 32 & 80; Defendant Dr. Mannava affirmed the decision to discontinue Plaintiff's Neurontin prescription on October 28, 2013.[13]  First, the Court notes that "[a]s a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011); *see also Roseboro v. Gillespie*, 791 F. Supp. 2d at 369 (collecting cases).  Plaintiff has offered no basis to find that Dr. Mannava retaliated against Plaintiff for grievances filed against Ferguson other than conclusory statements that they were in a conspiracy together.  *See* Pl.'s Dep. at p. 169.  Furthermore, the only circumstantial evidence that Dr. Mannava acted with a retaliatory motive is the temporal proximity to when Plaintiff filed his grievances.  However, where the only evidence of a retaliatory motive is the temporal proximity to the adverse action, that is insufficient to survive summary judgment.  *See Roseboro v. Gillespie*, 791 F. Supp. 2d at 370.  Weighing the skepticism with which it is to view retaliation claims, the Court finds that Plaintiff has not met his burden of showing a causal connection between his protected activities and Dr. Mannava's decision to discontinue his Neurontin prescription.

At his Deposition, Plaintiff also stated that Defendant Dr. Mannava retaliated against him by providing false testimony at a disciplinary hearing.  Pl.'s Dep. at pp. 171-72.  Plaintiff was charged with urinating in the yard; at the disciplinary hearing, he called Dr. Mannava as a witness to testify that he would have been unable to hold his urine because he was diabetic and was on a medication that caused him to urinate more frequently.  *Id.*  Dr. Mannava, however, testified that

---

[13] As with Defendant Ferguson, there is no evidence in the record that Defendant Dr. Mannava was aware of Plaintiff's other informal letters complaining of his medical treatment at Mid-State.

Plaintiff could have held his urine, which caused Plaintiff to be found guilty of the charge. *Id.* This retaliation claim was not raised in Plaintiff's Complaint and need not be considered by the Court. *See Flemming v. Wurzberger*, 490 F. Supp. 2d 320, 324 (W.D.N.Y. June 21, 2007). Nevertheless, Court agrees with Defendants that Plaintiff has offered no basis to find that Dr. Mannava's testimony constitutes an adverse action or was made with a retaliatory motive.

Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Cross-Motion be **DENIED** as to Plaintiff's retaliation claims against Defendants Dr. Mannava and Dr. Ramineni.

### E. Summary

In summary, the Court recommends that Defendants' Motion for Summary Judgment be **granted in part** as to all of Plaintiff's claims, with the exception of Plaintiff's Eighth Amendment deliberate indifference claim against Defendants Ferguson and Dr. Mannava based on the discontinuation of Plaintiff's Neurontin prescription. The Court recommends that Plaintiff's Cross-Motion for Summary Judgment be **denied**.[14]

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 31) be **DENIED** as to Plaintiff's Eighth Amendment deliberate indifference claim against Defendants Ferguson and Dr. Mannava based on the discontinuation of his Neurontin prescription and **GRANTED** in all other respects; and it is further

---

[14] Because the Court recommends that Plaintiff's Cross-Motion for Summary Judgment be denied in its entirety, the Court does not address Defendants' argument that Plaintiff's Cross-Motion should be denied on account of his failure to comply with Local Rule 7.1(a)(3).

**RECOMMENDED**, that Plaintiff's Cross-Motion for Summary Judgment (Dkt. No. 64) be **DENIED**; and it is further

**RECOMMENDED**, that if the above recommendations are accepted, Defendants Dr. Carl Koenigsmann, Dr. Subbarao Ramineni, and Pamela Reese be **DISMISSED** from this action and the case be deemed trial ready on the claims that survive; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).


Date: September 8, 2016
Albany, New York




_____
Daniel J. Stewart
U.S. Magistrate Judge